THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* EDWARD B. SCHWARTZ, BERNARD H. PALLANT, EDMUND TENNER and LEOPOLD WOLF, Appellants.

First Department, December 28, 1945.

*Theodore Kiendl* of counsel (*William R. Meagher* and *Abraham J. Gellinoff* with him on the brief; *Abraham J. Gellinoff*, attorney), for appellant Edward B. Schwartz.

*Louis Okin* for appellant Bernard H. Pallant.

*Leo C. Fennelly* of counsel (*Fennelly, Lowenstein, Engelhard & Pitcher,* attorneys), for appellants Edmund Tenner and Leopold Wolf.

*Whitman Knapp, Assistant District Attorney* of counsel (*Richard G. Denzer* and *Wyllys S. Newcomb, Assistant District Attorneys* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

MARTIN, P. J. The appellants have been convicted of the crime of conspiracy to falsify books, reports and statements of a corporation which is subject to the Banking Law, and of three crimes of forgery in the third degree. The record discloses an elaborate scheme to defeat the usury laws and collect excessive amounts of interest by devious methods.

The indictment covered the period November 1, 1935, to March 1, 1940. The basic charge is that the conspirators caused to be made many usurious loans by exacting from borrowers sums of money in the guise of insurance premiums in excess of the charges permitted by the Banking Law. In furtherance of the conspiracy and to meet the scrutiny of the examiners of the State departments, false and fraudulent entries were made in the books of the corporations through which the appellants conducted the operations. The corporations involved are Madison Personal Loan, Inc., a New York corporation duly licensed under article IX of the Banking Law; United American Lloyds, a Lloyds type insurance company with a legislative charter; Independent Agency Company, Inc., an attorney in fact for United American Lloyds; Wilten Agency, Inc., which, while holding a broker's license, was in reality a complete insurance unit; Avon Finance Corporation; Metro Factors, Inc., and Delmar Factors, Inc.

Avon Finance Corporation had a contract with Madison Personal Loan, Inc., whereby notes and mortgages were to be sold by Madison to Avon or the latter's designee, and this contract provided, among other things, that insurance was to be procured from brokers or companies approved or designated by Avon. Avon also had the right to designate Madison's bookkeeper and fix her salary. Delmar Factors in 1936 agreed to purchase from Metro Factors all of the outstanding capital stock of Madison Personal Loan, Inc., for a consideration of $25,000 payable in monthly installments of $600, the last of which was due February 1, 1940, and during

this period Metro was to retain full title to the Madison stock until the last note was paid and all the terms and conditions of the agreement were fulfilled. Delmar guaranteed the performance of the contract between Madison and Avon under which Madison was to sell its notes and mortgages to Avon, procure insurance through brokers or companies designated by Avon, and employ a bookkeeper selected by Avon at a salary fixed by it.

Madison Personal Loan, Inc., was limited by article IX of the Banking Law (§ 352) to the making of loans not exceeding $300. In most instances the loans made by Madison were secured by a chattel mortgage on the borrower's automobile. Madison was within its rights in requiring the borrower to insure for its benefit the automobile pledged as collateral. However, Madison could not impose such a condition as a cover for obtaining greater compensation than the law permits (*Martorano* v. *Capital Finance Corp.*, 289 N. Y. 21, 23–24).

The trial court charged the jury that if the transactions between Madison and the borrower were for the purpose of protecting Madison in the event of damage or loss to the collateral for the loan, such transactions were legal; but if the true purpose was to secure excess compensation to Madison, a different result would obtain. The trial court instructed the jury, "insurance which is merely a cover for obtaining to the lender greater compensation on the loan than the law permits is not lawful * * *. Whether such is the case here is for you to say."

A typical transaction may be summarized as follows: The borrower had to sign two papers before obtaining a loan. One was a combination note and chattel mortgage by which he undertook to pay off the loan at the statutory rate of 3% per month on the unpaid balance not exceeding $150, and 2½% per month on the unpaid principal balance exceeding $150, and he mortgaged his automobile to Madison as security for such obligation. The other paper was an application for insurance which purported to direct Wilten Agency, Inc., to place with United American Lloyds a specified amount of automobile insurance in favor of the borrower and Madison "as their interest may appear." After signing such papers the borrower would receive a Madison check for the face amount of his loan, less a filing fee and less the insurance premium (generally ranging from $10 to $30) fixed in his application for insurance. The application contained a table of some fourteen possible risks against which the borrower might wish to

insure, and by its terms a policy could be written either on a single interest or a double interest basis, the former protecting Madison's interest in the car alone, while the latter was to cover the interest of both Madison and the borrower. The rates for single interest coverage were comparatively low, a total premium of between $5.50 and $10 depending upon the size and date of the loan, but the amount of the premiums which could be collected on double interest coverage could run as high as $60 for collision insurance.

The record indicates that the clerks making the loan on behalf of Madison did not know the rates and did not discriminate between single coverage and double coverage. The clerks of Madison exacted the premium. The witness Fox, a loanmaker at the Jamaica branch of Madison, testified that they would take "from the borrower as much as we could get." The record indicates that during part of the period covered by the indictment, neither the loan-making clerk nor the borrower knew what kind of insurance was being purchased.

After the borrower had executed the application, it would be sent by Madison to Wilten, together with a check for the amount of the premium named in the application. Wilten employees would then prepare a certificate of insurance, breaking down the lump sum premium into individual coverages which would conform to the insurance rates as published in the manuals. Where the application was blank they would try to work out a combination of coverages which would consume the gross premium collected. Sometimes, however, they were unable to arrive at precisely the correct combination of coverages, in which event they would either assign a higher value to the insurance and make up the difference by taking it out of Wilten's petty cash or they would fix the lower value and remit the difference to Madison for credit to the borrower's account. To avoid the latter alternative they resorted to the device of issuing a policy for a fifteen months' period even though the loan agreement was for a year or less.

About 98% of all policies were written on a double interest basis. During the years 1937 through 1939 Wilten took in over $300,000 and paid out about $18,000, or about 4½% of the gross premiums, to persons other than Madison, and this sum included all expenses incident to any claim.

The record establishes that moneys exacted in the form of premiums came back to Madison through the medium of false claims. When Madison needed money, the bookkeeper for Madison would go through delinquent accounts, select a

group of them, calculate the net unpaid balance of the loans shown and the group would then be sent to Wilten. Proofs of loss would be prepared at the Wilten office and these would be executed by Madison with indifference to determination of the fact that an insurable loss had been suffered. It appears that in some instances conversion claims were made where Madison had actually repossessed the car and resold it. When checks were received from Wilten they were credited on Madison's books. Madison, however, still insisted that the borrowers continue to pay. If Madison were fortunate enough to collect from borrowers, such collections were credited to the Wilten account.

The proof here leaves no doubt that what the lender Madison wanted was not bona fide insurance protection. It was going through the form of insuring the car as a cover for the unlawful exaction of excessive compensation by way of the insurance premium which the borrower had no choice but to pay.

Tenner and Wolf were officials of Madison and, as such, had general supervision of the loans, the obtaining of the insurance premiums from borrowers and the collection of the insurance claims from Wilten. Apart from their official identity with Madison, there is testimony that Tenner personally participated in transactions with individual borrowers and that Wolf participated in the collection of insurance claims from Wilten. The appellant Pallant, as president of Wilten, personally instructed employees of Wilten with respect to their handling of the borrowers' applications for insurance and the making of bookkeeping entries covering the claims. As to the appellant Schwartz, the proof is that he owned Metro Factors which in turn owned Madison. Despite the agreement with Delmar covering the sale of the Madison stock, Metro retained all the beneficial rights of the Madison stock until the final payment by Delmar which, under the agreement, was to be made in 1940. Through his ownership of Metro, Schwartz controlled Madison. The testimony of the witness Kohn establishes that Schwartz participated in the financial affairs of Madison. Schwartz also owned Avon, and Madison's agreement with Avon required it to place insurance with the company selected by Avon. The insurance was placed with United, which Schwartz owned. The testimony of the witness Hamilton shows that Schwartz was familiar with the use of the insurance premium scheme to enable the lender to make large profits in the small loan business.

The appellants contend that there was no direct proof of the conspiracy, but the testimony as to their conduct and the evidence disclosed by the records fully warrant the finding by the jury of the existence of a conspiracy.

There is proof of the falsification of the books. To establish that, it was shown that there was in fact no collision in which the so-called Kander-Sable automobile was involved. That car had been surrendered to Madison and the borrower released from liability under the loan before the claim was made. Nor were the Sizer and Pope cars converted. The Sizer car had been in possession of Madison for over a month before the conversion claim was made, and the Pope car had no conversion coverage. It is urged that in the absence of proof of what is referred to as Master Policy No. 101, it is impossible to characterize the claims as fraudulent and the entries as false. The proof offered by the People, however, establishes that it was impossible for the appellants' insurance company lawfully to provide coverage such as is claimed by the appellants. There had been no Insurance Department approval of such forms of coverage, and the rating organization of which the insurance company (United) was a member, limited conversion claims to wrongful conversion, embezzlement or secretion by a borrower and permitted such a claim only after the loan company had made all reasonable efforts to locate the borrower, collect overdue balances and repossess the automobile in connection with which the claim was asserted. It, also, limited collision coverage claims to impairment of the interest of the loan money as a result of one accidental collision or upset.

The record establishes that the claims asserted were false and any book entries based on such false claims were likewise false. (*People* v. *Rabenold*, 262 App. Div. 737, affd. 287 N. Y. 832.) As to the falsification of the books, the proof is that the appellants Tenner and Wolf had charge of the proof-of-loss system for Madison, Pallant supervised the activities of Wilten clerks in the making of the bookkeeping entries, and it is clear from the record that Schwartz is responsible for the initiation of the insurance plan which culminated in the payment of the false claims and he is chargeable therewith, although there is no proof of specific directions concerning particular entries.

We find no errors either in the charge or in the rulings of the trial court which justify interference with the verdict of the jury. The judgments of conviction and the orders should be affirmed.

COHN, J. (dissenting). In my opinion the guilt of the four defendants-appellants of the crime of conspiracy (Penal Law, § 580, subd. 1) as charged in the first count of the superseding indictment was not established beyond a reasonable doubt.

This count alleged that defendants from November 1, 1935, to March 1, 1940, unlawfully conspired to cause the corporation, Madison Personal Loan, Inc. (hereinafter referred to as " Madison "), to charge and receive interest in addition to the legal maximum rate prescribed by section 352 of the Banking Law, and that the usurious interest took the form of " a fee in the guise of a premium for insurance " which Madison would obtain from its borrowers and forward to an insurance company, and which would be returned to Madison under the pretext of payment of insurance losses based on false proof of claims.

Madison made loans to borrowers who owned automobiles. The borrower would sign a note and execute a chattel mortgage on the car to Madison. In addition to paying the interest rates permitted by statute, the borrower was required to pay the insurance premiums to cover the cost of insuring the auto for Madison's benefit generally for fire, theft, collision and conversion. The prosecution's theory was that the four defendants conspired that Madison should receive, and that it actually did receive, more compensation than that permitted by statute (Banking Law, § 352) by payments from the United American Lloyds (an insurance company) upon false insurance claims presented through Wilten Agency.

As a condition of making a loan, Madison had the right to require the borrower to insure for its benefit the automobile pledged as collateral. (*Martorano* v. *Capital Finance Corp.,* 289 N. Y. 21, 24.)

Madison charged and collected the rates of interest permitted by statute on all loans. Only the lawful insurance premiums were paid. All premium moneys received by Madison were transmitted to United American Lloyds up to July 5, 1938, and thereafter to Fidelity-Phenix Insurance Company, a nationally known insurance corporation. There was involved no scheme whereby under the guise of insurance an additional charge was made without actually placing the insurance. Upon the alleged false claims, Madison never received more than the unpaid balance of the loans plus interest and repossession expenses. The sums so recovered by Madison on insurance claims were always credited to the borrower's account. Whether losses claimed by Madison were recoverable under the terms

of the policy or not, the losses themselves were not fictitious but real and the amounts received by Madison from the insurance companies never exceeded the amount due on the loan from a given borrower. In my view there was no proof that Madison, the lender, ever received compensation in excess of that authorized by statute.

As was stated in the *Martorano* case, *supra,* 24: " The test, then, is whether the lender has placed upon the borrower the burden of an additional charge in order to give to the lender ' compensation in excess of that contemplated by the statute.' * * * Under no circumstances can the lender receive more than the principal amount of the loan and the compensation expressly permitted by the statute." Madison never received more than the principal amount of its loan in *any* case.

The conspiracy count in the indictment should have been dismissed.

To determine whether there were false entries and forgeries as claimed in the felony counts upon which defendants were convicted, it was necessary to show that the alleged false entries were *in fact false.* In the absence of proof of the terms of the open policy of insurance existing between the insurance companies and Madison, there could be no showing that any claims for insurance paid by United American Lloyds to Madison were false. In any event, the felony counts upon which defendants were convicted, as the court correctly charged, could not stand if the conspiracy count had not been established.

It is not denied that the Banking Department examined and licensed Madison annually throughout the period of the alleged conspiracy. Admittedly, too, the United American Lloyds, owned by defendant Schwartz, was duly licensed by the Superintendent of Insurance of this State and was thereafter under his supervision. The crimes alleged were not based upon any complaint of the State Banking Department or of the State Department of Insurance. Testimony which formed the basis of the charges was supplied by a former employee who herself had been indicted in 1938 for larceny of a large sum of money from Madison and forgery in connection therewith. Before these defendants, each of whom appears to have borne a good reputation, may be convicted and imprisoned for the misdemeanor and felonies charged, their guilt should be established beyond a reasonable doubt. This, in my opinion, the proof adduced did not do.

For the foregoing reasons I vote to reverse the judgment of conviction and for a dismissal of the indictment as to each defendant.

TOWNLEY and DORE, JJ., concur with MARTIN, P. J.; COHN, J., dissents in opinion in which GLENNON, J., concurs.

Judgments and orders affirmed.